**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JANE DOE, individually and as parent
and natural guardian of JOHN DOE, a minor,

Plaintiff,

v. Case No. 6:26-cv-2710

GOOGLE LLC,

Defendant.
_________________________________/

**COMPLAINT AND DEMAND FOR A JURY TRIAL, AND PERMANENT INJUNCTIVE RELIEF REQUESTED**

Plaintiff Jane Doe, individually and as parent and natural guardian of her minor son, who is identified in this Complaint by the pseudonym "John Doe[1]," sues Defendant Google LLC and alleges:

## INTRODUCTION

1. John Doe is an eleven-year-old professional actor. When he was eight, he appeared in a supporting role (the "Role") in a major studio horror film based on a popular video game franchise (the "Film"). The Film opened in theaters in the fall of 2023 and grossed more than $290 million worldwide. Nine days later, chatbots built to imitate John began to appear on Character.AI, a chatbot product operated by non-party Character Technologies, Inc. ("Character, Character.AI or

[1] Plaintiff has concurrently filed a motion for leave to proceed under pseudonym.

C.AI") and built on technology, computing infrastructure, personnel, and money supplied by Defendant Google LLC.

2. Character.AI allowed anyone with an account to create a public chatbot "Character" based on a real person by typing in that person's name, uploading his photograph, and adding a few lines of description. A large language model then spoke as that person, in the first person, to anyone who opened a chat. That model grew out of conversational technology first developed at Google by the engineers who went on to found Character Technologies, Inc., and it was trained and run on Google's cloud infrastructure and Google's specialized chips. No one asked whether the real person had consented, and no one asked whether the real person was a child. Likewise, there was no security feature implemented that effectively verified whether the real person had consented to the use of their photograph, name, or likeness, and there was no security feature in place to ensure that the real person was not a child.

3. From November 2023 through at least September 2025, users published at least fourteen Characters on Character.AI that used John's name, his professional photographs, and/or the Role. At least five carry his full legal name. They were created when he was eight, nine, and ten years old. Their descriptions call him "cute" and "loyal," comment on his body, and disclose the city where he lives and the month of his birthday. Character.AI's search results grouped them under labels such as "Boyfriend." Users opened these Characters in tens of thousands of chats.

4. Google was not a passive vendor. Its own engineers built the conversational models from which Character.AI's technology grew, and, on information and belief, Google declined to release those models under its own name because they did not meet its safety and fairness standards. When those engineers left to bring the same kind of product to the public elsewhere, Google became their infrastructure partner and creditor and supplied the specialized hardware without which, in the words of one of Character Technologies' founding engineers, Character.AI "wouldn't be a product."[2] In August 2024, Google paid approximately $2.7 billion for a non-exclusive license to the technology and for the return of the founders and their research team. Characters bearing John's full legal name continued to be created on Character.AI after that transaction closed.

5. The Characters coincided with, and fueled, a campaign of real-world harassment. Within weeks of the first Characters, organized fan groups began calling John's family's phones at all hours. John was the target of video threats, stalking, racial and homophobic abuse, images of mutilated bodies, a threat to kill his mother, the public identification of his school, and sexually explicit material attributed to him. At nine years old he told a classmate he wanted to die. He has required medical and psychological care (which is ongoing), his grades collapsed, and he withdrew from the public appearances that would have built on the Film when his profile was highest.

---

[2] Myle Ott, Founding Engineer at Character.AI, GOOGLE CLOUD, *How Character.AI Leverages AI Infrastructure to Scale Up*, https://www.youtube.com/watch?v=gDiryEFz6JA&t=39s (Aug. 29, 2023).

6. On October 12, 2026, Character Technologies filed a chapter 11 petition and Plaintiff's claims against it are stayed.[3] Character Technologies' chief executive has stated under oath that the company has faced declining liquidity and high costs from operating its business and defending various lawsuits and regulatory investigations relating largely to safety concerns surrounding Character's products. Adams Decl. ¶ 25, D.I. 18. Plaintiff brings this action against Google for Google's own conduct: its role in designing and supplying the technology at the core of Character.AI without meaningful safeguards, the substantial assistance it gave with knowledge of the risks that product posed to children, and the undertaking it assumed when it chose to power and finance that product.

**PARTIES**

7. Plaintiff Jane Doe is the mother and natural guardian of John Doe. She brings this action individually and on John's behalf under Federal Rule of Civil Procedure 17(c) and section 744.301, Florida Statutes. Ms. Doe and John reside in Lake County, Florida, and are citizens of Florida.

8. John Doe was born in 2015 and is a minor. Because this case concerns the misappropriation of his identity and a campaign of threats and stalking directed at him, Plaintiff has moved for leave to proceed under a pseudonym and

[3] Declaration of Colin M. Adams in Support of the Debtor's Chapter 11 Petition and First Day Motions ¶ 4, *In re Character Technologies, Inc.*, No. 26-11603 (BLS) (Bankr. D. Del. Oct. 13, 2026), D.I. 18 (Character Technologies commenced a voluntary chapter 11 case on October 12, 2026); Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re Character Technologies, Inc.*, No. 26-11603 (Bankr. D. Del. Oct. 12, 2026), D.I. 1; 11 U.S.C. § 362(a).

for a protective order limiting disclosure of his true name and other identifying information. Plaintiff will disclose John's identity to Google under that order.

9. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. Google's sole member is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and no member of Google is a citizen of Florida. *See* Google LLC's Disclosure Statement at 2, *Garcia v. Character Technologies, Inc.*, No. 6:24-cv-01903 (M.D. Fla. Dec. 16, 2024), Doc. 45. Google is registered to do business in Florida.

10. Non-party Character Technologies, Inc. ("Character Technologies") is a Delaware corporation with its principal place of business in Menlo Park, California. Character Technologies designs, develops, operates, markets, and distributes the Character.AI website and mobile applications (together, "Character.AI").

11. On October 12, 2026, Character Technologies filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. In re Character Technologies, Inc., No. 26-11603 (BLS) (Bankr. D. Del.). Because of the automatic stay under 11 U.S.C. § 362(a), Character Technologies is not named as a defendant, and Plaintiff asserts no claim against it in this action. Plaintiff reserves all claims against Character Technologies and its estate, including the right to seek relief from the stay and to file a proof of claim. The allegations in this Complaint about Character Technologies' conduct

describe the product Google helped build and supply and the wrongs Google assisted. They are not a request for relief against Character Technologies. Nothing in this Complaint is an act to obtain possession of property of the estate or to collect, assess, or recover a claim against Character Technologies. Plaintiff does not allege that Character Technologies and Google were joint venturers or that either is the alter ego of the other, and reserves the right to seek leave to amend if discovery supports such allegations.

12. Noam Shazeer and Daniel De Freitas Adiwarsana founded Character Technologies. Both worked for Google before November 2021 and returned to Google in August 2024 as part of the transaction described in paragraphs 34 and 35. Mr. Shazeer left Google in or around June 2026, and, on information and belief, Mr. De Freitas remains employed by Google. They are not named as defendants. Their conduct while employed by Google, and the conduct of other Google personnel described in this Complaint, is attributable to Google because each acted within the course and scope of his or her employment or agency with Google and in furtherance of Google's business. Google is vicariously liable for the acts and omissions of its employees and agents, including Mr. Shazeer and Mr. De Freitas while employed by Google, under the doctrine of respondeat superior and general principles of agency.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff and John are citizens of Florida. Google is a citizen of Delaware

and California through its member. The amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court has specific personal jurisdiction over Google under section 48.193(1)(a)(1), (2), and (6), Florida Statutes, as alleged in the following paragraphs.

15. Google operates, conducts, engages in, and carries on a business in Florida. It maintains offices and employees in Florida, sells Google Cloud services to Florida customers, and through its Google Play store distributes mobile applications to Florida residents and collects payment for purchases they make within those applications. Google distributed the Character.AI application to Florida residents through Google Play, and the computing infrastructure Google operated delivered Character.AI's output to users in Florida. Plaintiff's claims arise from that business.

16. Google committed tortious acts within Florida. The technology and infrastructure Google supplied operated in Florida each time a user in Florida opened a Character, and Google's conduct caused injury to a Florida child in Florida. The Characters built on John's identity stated that he lives in Florida.

17. Google caused injury to persons within Florida arising out of acts and omissions outside Florida, and at or about the time of the injury, products, materials, or things processed, serviced, or manufactured by Google, including the computing services and model technology on which Character.AI ran, were used or consumed in Florida in the ordinary course of commerce.

18. Exercising personal jurisdiction over Google is consistent with due process. Google purposefully availed itself of the Florida market for cloud services and mobile applications and of the privilege of supplying, powering, and later licensing a consumer product it knew was marketed to and used by Florida residents, including Florida children. Plaintiff's claims arise out of and relate to those contacts. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021). Exercising jurisdiction here comports with fair play and substantial justice.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred here and John suffered his injuries here.

20. Plaintiff and John reside in Lake County, which Local Rule 1.04(a) assigns to the Ocala Division. This action is properly brought in the Orlando Division under Local Rule 1.04(b) because it is the division to which the action is most directly connected and in which it will be most conveniently advanced. John's neurological care has included an April 2026 admission at Nemours Children's Hospital, Florida, at 6535 Nemours Parkway, Orlando, Florida 32827. John's invitation to the January 13, 2024 fan convention[4] followed from the Role, which was booked by his Orlando-based talent agency, Central Florida Talent, located at 8810 Commodity Circle, Suite 33, Orlando, Florida 32819. The related action identified in Plaintiff's Notice of Related Action, which involved Google, the same

[4] The name of that convention is reserved for Plaintiff's sealed notice under Local Rule 1.11.

product, and overlapping allegations about Google's role, was litigated in this Division until the Court dismissed it on October 19, 2026, and assignment here will promote the efficient resolution of common issues.

## GENERAL ALLEGATIONS

### A. Google Developed the Technology Behind Character.AI

21. Before they founded Character Technologies, Mr. Shazeer and Mr. De Freitas worked as engineers at Google, where they developed large language models, including the conversational models known as Meena and LaMDA.[5] Mr. Shazeer was also a co-author of the 2017 Google research paper that introduced the transformer architecture on which modern large language models are built. Character Technologies has stated under oath that its founders were pioneering AI researchers who left Google to develop chatbots based on their work with "transformer" artificial neural network architecture. Adams Decl. ¶ 16, In re Character Technologies, Inc., No. 26-11603 (BLS) (Bankr. D. Del.), D.I. 18.

22. On information and belief, the engineers asked Google to release their conversational model to the public, and Google refused, citing its safety and fairness policies. On information and belief, Google personnel had raised concerns about the risks of conversational models of this kind, including the risk that users would attribute human identity and feelings to them. Google encouraged the engineers to stay at Google and continue developing the technology there.

---

[5] *See* Ashish Vaswani et al., *Attention Is All You Need*, arXiv:1706.03762 (June 12, 2017; rev. Aug. 2, 2023), https://arxiv.org/abs/1706.03762 (last visited Oct. 18, 2026).

23. Mr. Shazeer has said publicly that he left Google because he wanted to get the technology "out to as many people as possible" and to "maximally accelerate" it. In November 2021 Mr. Shazeer and Mr. De Freitas left Google and formed Character Technologies.

24. On information and belief, Character.AI was designed and developed on Google's architecture, and Google contributed intellectual property and artificial intelligence technology to the design and development of the large language model that powers Character.AI.

25. The large language model architecture on which modern conversational models, including Character.AI's, are built is Transformer, which Google researchers, including Mr. Shazeer, introduced in a 2017 Google paper. Mr. Shazeer and Mr. De Freitas then led the development at Google of LaMDA, a Transformer-based model trained for open-ended dialogue and persona play.

26. On information and belief, Character Technologies built its first models using the same design approach, training methods, and know-how that its founders had developed for LaMDA at Google, and Google knew it. Google did not treat that technology as a generic product. It chose, as an investor, creditor, and infrastructure partner, to help integrate it into a consumer product that Google itself had declined to release.

27. Character Technologies launched Character.AI to the public in September 2022. Character.AI is available through a website and through mobile applications distributed in the Apple App Store and the Google Play store. It allows

users to converse with chatbots, which Character Technologies calls "Characters," that are powered by large language models trained and run on computing infrastructure supplied by Google.

28. Character.AI has millions of daily users, a large share of whom are minors and young adults. Character Technologies earns revenue from Character.AI through a paid subscription tier, c.ai+, and, on information and belief, through advertising.

**B. Google Powered, Financed, and Then Licensed Character.AI**

29. In 2023 Character Technologies and Google publicly announced a partnership under which Google Cloud supplied the computing infrastructure, including Google's proprietary tensor processing units ("TPUs")[6], used to train and run Character.AI's models. Myle Ott, a founding engineer at Character Technologies, stated in a video produced for Google Cloud that, without Google's accelerators, Character.AI "wouldn't be a product."[7] In the video, Ott explained that Character's AI infrastructure relied heavily on Google's hardware accelerators (such as TPUs and other specialized chips) to run its models and deliver the interactive, multimodal experiences the platform offers. Ott's statements

[6] TPUs are custom-designed application-specific integrated circuits (ASICs) developed by Google. They are purpose-built from the ground up to accelerate machine learning and artificial intelligence workloads. TPUs are optimized specifically for the heavy matrix multiplication and tensor operations that act as the fundamental building blocks of neural networks, powering everything from large language models to complex reasoning agents. *See* GOOGLE CLOUD, *Tensor Processing Units*, https://cloud.google.com/tpu (last visited Oct. 18, 2026).
[7] *See supra* note 2.

underscore that Google's hardware was not just a supporting component but a core enabler of Character.AI's performance and feasibility.

30. The services Google supplied were not generic services available to any member of the public. On information and belief, Google gave Character Technologies access to specialized accelerator capacity available only to a small number of sophisticated customers, tailored those services to Character Technologies' needs in training and serving its models, and assigned Google personnel to help Character Technologies optimize its models on Google hardware.

31. In May 2023, Google Cloud and Character Technologies publicly announced an expanded partnership under which Character Technologies would use Google Cloud's tensor processing units and graphics processing units to train and serve its models. Google promoted Character.AI as a showcase customer for its accelerator hardware.

32. On information and belief, the integration work Google performed was specific to Character.AI's design. It included configuring and tuning serving capacity for real-time persona conversations, which is the function that let a Character of a real person respond instantly and at scale; advising on model optimization for Google hardware; and providing priority access to accelerator capacity during Character.AI's rapid growth in 2023 and 2024, the period in which the Characters built on John's identity were created.

33. On information and belief, Google provided these services on credit or at a discount and received a convertible note from Character Technologies in

return, and the value of the computing services and specialized chips Google provided reached tens of millions of dollars.

34. In August 2024 Google entered into a transaction with Character Technologies under which Google paid approximately $2.7 billion to obtain a non-exclusive license to Character Technologies' model technology, and rehired Mr. Shazeer, Mr. De Freitas, and members of their research team. On information and belief, Google's convertible note was retired as part of the transaction. Google did not acquire Character Technologies. It took a license to the technology and hired the people who had designed the product, while Character.AI continued to operate for the public, including children. As of October 12, 2026, Character Technologies stated under oath that it was a privately held company whose equity holders were all individuals who are current or former directors or employees of Character Technologies, and that it had no funded debt. Adams Decl. ¶¶ 17-18, D.I. 18.

35. In its chapter 11 case, Character Technologies has stated under oath that, in exchange for approximately $2.7 billion in total consideration, "Google rehired the founders of Character and Character granted a non-exclusive license of its technology at the time to Google and released certain claims that Character may have had against Google and certain other parties." Decl. of Colin M. Adams ¶ 19, *In re Character Technologies, Inc.*, No. 26-11603 (BLS) (Bankr. D. Del. Oct. 13, 2026), D.I. 18. Plaintiff was not a party to that release, and it does not affect her claims.

36. On information and belief, Google continued to supply computing services to Character Technologies after the August 2024 transaction, and Character.AI continued to run on models developed by the team Google had rehired. Characters bearing John's full legal name were created on Character.AI on or about September 30, 2024, November 21, 2024, and September 6, 2025, and a Character presented under the Role's name was created on or about June 23, 2025, all after the transaction closed.

37. Google also distributed the Character.AI application through Google Play. On information and belief, Google reviewed the application under its Google Play policies, assigned or approved its content rating, and received a commission on purchases made through the application.

**C. What Google Knew**

38. Through its own research on conversational models, its multi-year partnership with Character Technologies, and the due diligence it conducted before paying approximately $2.7 billion in 2024, Google knew, or reasonably should have known, that Character.AI was used heavily by minors, that Characters based on real people were a core feature of the product, that Character Technologies' Terms of Service ("ToS") prohibited the impersonation the product invited, that Character Technologies did not screen for Characters based on real children, and that the technology underlying Character.AI presented risks that Google had refused to accept under its own name.

39. On information and belief, Google knew or should have known that the combination of Character.AI's predominantly young user population, its ability to simulate identifiable real persons, and its absence of meaningful identity-verification or parental-consent safeguards created a foreseeable risk that actual children would be impersonated, sexualized, exploited, and subjected to unwanted attention and harassment. Unlike fictional characters, the real children whose identities were appropriated had no ability to control what their artificial counterparts said, how they were portrayed, who interacted with them, or how those interactions would affect their safety, reputations, and psychological well-being. These risks were not incidental to the product's operation; they arose from the very features that made Character.AI attractive to its users.

40. On information and belief, Google's own policies for its generative artificial intelligence products prohibit using those products to impersonate real people without disclosure and to generate content that sexualizes minors. Google therefore knew the specific risks at issue here and knew how to guard against them.

41. Google had the means to require safeguards. It controlled the infrastructure on which Character.AI ran, held a convertible note, and in 2024 negotiated a multibillion-dollar transaction with Character Technologies. On information and belief, Google never conditioned its services, credit, investment, or license on Character Technologies adopting protections for real children whose identities were used to create Characters.

## D. How Characters Are Created and Who Speaks Through Them

42. Character Technologies designed Character.AI so that any user, including an anonymous user, can create a Character in minutes. The creator enters a name, uploads an avatar image, and may add a short "tagline," a longer description, a "greeting," and a "definition." The creator then chooses whether the Character will be public, unlisted, or private. Character Technologies did not verify the identity or age of the users who created Characters, did not screen or vet those users, and did nothing to prevent anonymous or unverified users, including adults seeking to impersonate, sexualize, exploit, or harass children, from creating and publishing Characters depicting real children.

43. Character Technologies' own materials told users that a Character could be "fictional or based on real people, dead or alive." Character Technologies did not require any verification that a Character based on a real person was created or authorized by that person, did not require parental consent for a Character based on a child, and did not screen for Characters based on real children, including child actors whose names and images were widely available online.

44. After a Character is created, everything the Character says in a conversation, other than the optional greeting, is generated by Character Technologies' large language model ("LLM"). Character Technologies decides how that model is trained, what it is and is not permitted to say, how it speaks in the persona of the named person, and whether it will stop. Character Technologies tells

users that creators cannot see the conversations others have with their Characters. Only Character Technologies can.

45. Character.AI displays public Characters in search results, category labels, and recommendation feeds that Character Technologies designs and controls. Character Technologies displays each Character's name, avatar image, tagline, creator handle, and a running count of chats, which signals popularity and encourages further use.

46. Beginning in or around November 2023, Character Technologies introduced a voice feature that allows Characters to speak aloud and, later, to conduct simulated voice calls. On information and belief, Character Technologies recommended and supplied voices designed to match the person a Character represented.

47. Character Technologies designed Characters to speak in the first person, to claim human experiences, and to sustain the impression that the user is talking to the person named. The only notice Character Technologies placed on these conversations was a line of small text stating, "This is A.I. and not a real person. Treat everything it says as fiction." That notice did not tell users that the real person had not consented, did not prevent the Character from claiming it was the real person in conversation, and did nothing to protect the real person, especially children.

48. Under its ToS, Character Technologies takes a perpetual, irrevocable, royalty-free license to "exploit, commercialize and otherwise use" every Character

and every conversation "for any purpose," including "facilitating other users' ability to interact with the Character" and "promoting the Services on- or off-platform." On information and belief, Character Technologies also used conversations with Characters to train and improve its models.

49. The same Terms of Service prohibit content that "interferes with or appropriates any person's right of publicity by using their name, likeness or persona" without permission, and prohibit users from impersonating any person. Character Technologies therefore knew that users were creating Characters of real people without consent. It reserved to itself the right to remove such Characters "at any time and for any reason," but on information and belief, it did not take reasonable steps to detect or remove Characters based on real children, including John.

50. John was not the only child affected. On information and belief, during the same period Character.AI hosted Characters impersonating numerous other child actors, many of them younger than fourteen, using their names and professional photographs.

51. The foreseeable consequences of this technology were particularly severe for children like John. Unlike adults, children lack the maturity, resources, and practical ability to identify, investigate, and combat the unauthorized appropriation of their identities through artificial intelligence. A child whose name, photograph, and persona are used to create an artificial counterpart cannot control the statements attributed to him, the relationships strangers develop with

that counterpart, or the manner in which those interactions may be used to harass, humiliate, or exploit him. The dangers are magnified when the child is a recognizable performer whose identity is already accessible to a large online audience.

**E. John Doe and His Career**

52. John has worked as a professional actor since he was four years old and is SAG-eligible. Before October 2023 he booked, among other work, a guest appearance on a network late-night comedy program in August 2020; national commercials for an insurance company in January 2020, a credit card company featuring a professional athlete in June 2022, and a toy company in September 2023; voice work on several animated children's programs; and, in January 2023, the Role. He has voiced the lead character in a long-running children's animated television series since early 2022, a role credited across six seasons and approximately 130 episodes, and he filmed the Role in February 2023 at age seven.

53. The Film is based on a video game and book franchise with a large and intensely engaged online fan base, much of it made up of children and teenagers, the same audience that uses Character.AI heavily. The Film's commercial success made John recognizable to that audience, and a sequel to the Film was released in December 2025.

54. John's name, image, voice, and persona have substantial commercial value, and the market has confirmed it. Demand for John's work rose, rather than fell, during the period described in this Complaint. His agency forwarded 38

audition requests to him in 2024, 82 in 2025, and 74 in 2026 through October 1, 2026, for film, television, animation, and national commercial projects, at least 196 requests in all between October 2023 and October 2026. A casting platform he uses records 105 self-tape auditions between January 2022 and October 2026, and a second platform records approximately 497 casting notices. He has recorded on a weekly basis for his animated series and, from 2025 through October 2026, has voiced the lead character in an educational children's series. Before the events described below, he also earned income from paid appearances at fan conventions and was positioned for endorsement and merchandising opportunities of the kind routinely offered to child actors with major studio credits. That sustained and growing demand measures the market value of John's career and of the opportunities he has been unable to pursue.

55. The commercial value of John's identity now includes the value of its use in artificial intelligence. On October 8, 2026, in connection with a voice booking, John's voice agency sent his family an "AI rider" for signature, reflecting that producers now negotiate and pay separately for the right to use a performer's voice and likeness with artificial intelligence. Character.AI, and the technology Google supplied, took that value from John for nothing.

56. John's professional social media account was operated by his mother and labeled as a parent-run page, consistent with industry practice, to discourage direct contact with him.

## F. Characters Built on John's Identity

57. Beginning nine days after the Film's release, users created public Characters on Character.AI that used John's name, his professional photographs, or the Role. Based on the avatar image upload dates visible on Character.AI and the family's records, those Characters include at least the following, each created or last updated on or before the date shown. Identifying words in the Character names are replaced with bracketed descriptions.

| Date | Character name as displayed | Creator handle |
|---|---|---|
| 11/05/2023 | [Role] -[Film] movie- | @Issy_the_First1 |
| 11/05/2023 | [Film character] from [Film] | @i_dont_have_wafes |
| 11/13/2023 | [Role] -[Film] movie- | @-baldie- |
| 11/19/2023 | [Role] [Film] MOVIE | @[Film]_FoX |
| 11/25/2023 | [Role] -[Film] Movie- | @Cutiepie_The_[Role] |
| 12/03/2023 | [Role] - [Film] | @basilshears |
| 12/27/2023 | [Role] - [Film] Movie | @Martyartz |
| 01/27/2024 | [John's full legal name] | @glitch_melody |
| 01/28/2024 | [Role] [Film] | @Raphaelazucar90 |
| 06/04/2024 | [Role] - [Film] movie | @RiversCuomos_guitar |
| 09/30/2024 | [John's full legal name] | @ItzCrimsonNotRed |
| 11/21/2024 | [John's full legal name] | @bentrifan |
| 06/23/2025 | [Role] -[Film] movie- | @KindlyCharChar |
| 09/06/2025 | [John's full legal name] | @cooldarrius |

58. John was eight years old when the first Character bearing his full legal name was created, nine when the second and third were created, and ten when the fourth was created.

59. Each Character listed in paragraph 57, and the Character described in paragraph 60, was a separate publication of John's name or likeness. Each was created by a different account on a different date, and each was separately displayed, indexed in search, and offered to users by Character.AI. Four of them

were created after Google's August 2024 transaction with Character Technologies: on September 30, 2024, November 21, 2024, June 23, 2025, and September 6, 2025. Three of those four bear John's full legal name.

60. A further public Character bearing John's full name, created by the account @Playtime_AI_Co, was described as the actor who played the Role in the Film.

61. Several of the Characters used, as their avatar images, John's actual professional and promotional photographs, so that a Character presented under the Role's name was, in substance, a Character of John himself.

62. A search of Character.AI for John's name returned at least five Characters bearing his full legal name. Character Technologies displayed these results alongside category labels that included "Boyfriend" and "Brother."

63. The descriptions Character Technologies displayed for these Characters made clear that each was meant to be John, the real child actor, and not a fictional figure. By way of example:

(a) One Character bearing his full name was tagged "He/Him, child actor, cute, loyal" and had been opened in 1,628 chats.

(b) Another, opened in 240 chats, spoke in the first person and stated the city in Florida where John lives and the month of his birthday.

(c) A Character presented under the Role's name, created on or about November 5, 2023, had been opened in approximately 47,000 chats.

64. There are presently no exhibits to this Complaint. To the extent that any such exhibits are later filed, they will be filed in redacted form consistent with Federal Rule of Civil Procedure 5.2 and any protective order the Court enters.

65. On information and belief, Character.AI also displayed content tags associated with romantic and sexual role-play, including “BL,” “GL,” “MLM,” and “WLW,” on Characters depicting minors, including Characters created when John was nine years old, and Character.AI users requested sexually explicit Portuguese-language translations involving child-actor Characters.

66. Each of these Characters used John’s name, photograph, or likeness. Each conversation with them was generated by Character Technologies’ model speaking as John or as the Role he portrayed.

67. On information and belief, at least one creator of a Character bearing John’s full name also followed John’s professional account on Instagram and was connected online to individuals who later harassed and threatened John’s family, as described below.

68. Neither John nor his parents consented to the creation, display, or use of any Character based on John. Character Technologies never sought consent, never notified the family, and continued to display these Characters to the public. On information and belief, Character Technologies had actual or constructive notice of these Characters through its own moderation systems, user reports, and the policies it adopted, and did not remove them promptly.

### G. What Happened to John

69. The Characters described above and the harassment John suffered rose together. As the Characters multiplied and accumulated chats, large numbers of users, adults and minors, began acting as though they knew John personally.

70. On or about December 19, 2023, about six weeks after the first Characters appeared, a large foreign-language role-play group devoted to the Film began a coordinated campaign of Instagram messages and calls to Ms. Doe's phone at all hours. Its messages and voice recordings consisted largely of role-play scripts built around the Film's characters, including the Role, with references to continuing the interaction on other servers.

71. On January 13, 2024, John attended his first fan convention, in Fort Myers, Florida, as a paid guest. Throughout that night, his mother's phone rang and vibrated without stopping with calls and messages from strangers. It was the first time John understood how many people were trying to reach him. He became extremely distressed, refused to return to the convention, and developed nocturnal enuresis that continued for months. It was his first and last convention appearance. The family cancelled all future appearances.

72. On or about January 21, 2024, John was tagged in a video threatening that "something bad" would happen. Six days later, on January 27, 2024, the first Character bearing his full legal name was created. On or about January 30, 2024, an individual posted a video that appeared to show him stalking John.

73. From February 2024 through April 2025, John and his family received stalking videos and photographs.

74. Individuals who contacted the family spoke as though they had already had conversations with John, and some posted fan art that matched the avatar images used for the Characters. Plaintiff did not understand why until late 2025, when she learned what Character.AI was and she and her daughter found the Characters described above.

75. In 2024, the school John attended was identified publicly online, and his family moved him to a different school for his safety.

76. On or about July 22, 2024, organized groups began a further harassment campaign directed at John that included racial slurs, homophobic slurs, images of mutilated bodies, and constant calls. An individual who had organized harassment of John across several platforms posted a message, in Portuguese, stating that if John stopped following him, he would kill John's mother.

77. Two months later, on September 30, 2024, and again on November 21, 2024, new Characters bearing John's full legal name were created on Character.AI.

78. In or around December 2024, a classmate showed John a draft social media post containing sexually explicit statements attributed to John, together with his name and photograph. The classmate said the content had been generated on Character.AI. The classmate then spread claims about the material among

students at John's school, and older children in the neighborhood confronted John about statements he never actually made. John and his sister told their mother that the statements were not John's and had been generated by artificial intelligence. She did not then understand what Character.AI was, believed the children were making excuses, and did not learn that Characters depicting John existed on Character.AI, or that Character.AI could be used to create lifelike impersonations of him, until late 2025, as alleged in paragraph 74.

79. John became withdrawn and despondent. A seizure disorder that had been well controlled recurred.

80. On or about January 10, 2025, John's teacher contacted Ms. Doe after learning that John, then nine years old, had told a classmate he was suicidal and had described an attempt to harm himself. The school then began having John meet with a school counselor.

81. Before the harassment, John was a straight-A student who tested in the 99th percentile in language and the 98th percentile in reading. Within two years, his grades fell to F's and his state assessment scores fell to the lowest level.

82. John has received, and continues to receive, medical, neurological, and psychological evaluation and treatment, and he will need psychological treatment in the future.

83. Because of the harassment and the fear and distress it produced, John withdrew from public life at the point when the Film had made him most marketable. He stopped appearing at fan conventions after January 2024 and did

not pursue the appearance, endorsement, and merchandising opportunities that follow a major studio credit. The same distress sharply reduced his ability to audition. Before the Characters appeared, John submitted on a substantially higher share of the audition requests he received. Upon information and belief, since November 2023, he has been able to submit on only approximately 10-20% of the audition requests forwarded to him, even as the number of those requests grew. John and his family declined the remaining requests because of his emotional distress, his fear of renewed exposure, and the effect of the harassment on his health. Each audition John could not attempt was a lost chance to book work, and he has lost bookings, income, and professional opportunities as a result. The momentum the Film should have produced was lost, and his future earning capacity has been substantially impaired.

84. The publication of Characters presenting John in romantic and sexual terms, and of sexually explicit material attributed to him, has damaged his reputation among his peers and in his profession.

85. Ms. Doe has incurred, and will continue to incur, expenses for John's medical and psychological care and has lost the value of John's earnings and services during his minority.

86. Character Technologies' model generated every conversation that users had with the Characters built on John's identity. Character Technologies' design choices made those Characters easy to create, easy to find, and persuasive, and its continued display of them made John a target.

### H. Google's Direct Role in the Harm to John

87. The Characters built on John's identity existed because Character.AI was designed to let anyone publish a Character of a real person and to have a large language model speak as that person. That design depended on conversational model technology that originated at Google and on Google computing infrastructure that trained and ran the model. On information and belief, the conversations users had with Characters built on John's identity were generated on Google's infrastructure.

88. Google knew the risks that design posed to real children and kept supplying the technology, infrastructure, and money that sustained it, before and after the August 2024 transaction, while Characters built on John's identity remained online and new ones were created.

89. Google benefited from that use. On information and belief, Google received revenue for its cloud services and its distribution of the Character.AI application, obtained access to Character.AI user and conversation data, including data relating to Characters built on John's identity, and obtained a license to model technology that had been trained on or refined using conversations on Character.AI.

### I. Google's Knowledge of Real-Person and Minor Impersonation

90. Google's knowledge was not limited to general risk. By the time it closed the August 2024 transaction, Google knew, on information and belief, that Characters impersonating real, identifiable people were a core and heavily used

feature of Character.AI; that a large share of Character.AI's users were minors; and that Character.AI had no consent or verification step for Characters of real people and no filter for the names or images of real minors. Google learned these facts through its multi-year infrastructure relationship and through its due diligence before paying approximately $2.7 billion.

91. In early October 2024 it was publicly reported that Character.AI hosted a Character impersonating a teenage girl who had been murdered in 2006, created without her family's knowledge or consent.

92. On October 22, 2024, a Florida mother sued Character Technologies and Google in this District, alleging that Character.AI's design harmed her minor son and that Google was liable as a component supplier and aider and abettor. *See Garcia v. Character Technologies, Inc.*, No. 6:24-cv-01903 (M.D. Fla.). In December 2024, further suits naming Google alleged that Character.AI harmed minors. From no later than October 22, 2024, Google had actual, specific notice that Character.AI was harming real minors and that the harm flowed from its design.

93. Google nonetheless continued to supply the technology, infrastructure, and money that sustained Character.AI. Characters bearing John's full legal name were created on November 21, 2024 and September 6, 2025, and a further Character based on the Role was created on June 23, 2025, all after Google had that notice.

94. Plaintiff does not seek to hold Google liable as the publisher or speaker of any information provided by another information content provider. Google is not alleged to have operated the interactive computer service on which the Characters appeared. Plaintiff's claims are based on Google's own conduct: designing and supplying components and participating in their integration into a defective product, its own negligence and undertaking, and its knowing and substantial assistance to Character Technologies. 47 U.S.C. § 230 does not apply to those claims.

95. John's injuries continued, and additional Characters depicting John were created, on or about September 30, 2024, November 21, 2024, June 23, 2025, and September 6, 2025, including after Google's August 2024 transaction and after the October 22, 2024 notice, as alleged in paragraphs 36, 92, and 93. The publication and promotion of Characters using John's identity was a continuing tort. Further, Plaintiff did not discover, and in the exercise of reasonable diligence could not reasonably have discovered, the Characters depicting John until late 2025, as alleged in paragraphs 74 and 78.

96. All conditions precedent to this action have been performed, excused, or waived.

## COUNT I

## Negligence

## (Against Google)

97. Plaintiff realleges paragraphs 1 through 96 as if fully set forth here.

98. By developing the conversational technology at the core of Character.AI, supplying and operating the infrastructure on which it ran, and financing and later licensing it, Google created a foreseeable zone of risk to the real people whose identities would be used to create Characters, including children. Google was in a position to control that risk and owed a duty to take reasonable precautions against it.

99. Google knew of the risk from its own research, from the reasons it gave for declining to release similar models under its own name, from its partnership with Character Technologies, and from its due diligence before the August 2024 transaction.

100. Google breached its duty by, among other things, supplying its model technology and infrastructure for use in a product that let the public publish simulations of real children without consent or verification; failing to condition its services, credit, investment, or license on basic protections for real minors, including age screening, identity verification, screening for known child performers, and a working takedown process; and continuing to supply the infrastructure and money that sustained Character.AI after it knew of these risks, including after October 22, 2024, when Google had actual notice of harm to minors from Character.AI, and after later Characters using John's identity were created on November 21, 2024, June 23, 2025, and September 6, 2025, as alleged in paragraphs 92 and 93. Google is also vicariously liable for the negligent acts and

omissions of its employees and agents described in paragraph 12, which were committed within the course and scope of their employment or agency.

101. Google's negligence was a direct and proximate cause of John's injuries. The campaign of harassment by third parties was a foreseeable result of a product that published a real child's identity to other users, including under category labels such as "Boyfriend," and does not supersede Google's liability. As a direct and proximate result, John suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, reputational harm, expense of medical and psychological care, and loss of earnings and earning capacity. Ms. Doe has incurred medical expenses for John's care and has lost the value of his earnings and services during his minority. These losses are continuing.

WHEREFORE, Plaintiff demands judgment against Google for compensatory damages, punitive damages, costs, interest as allowed by law, and such further relief as the Court deems just.

## COUNT II

### Strict Products Liability, Design Defect (Component Supplier and Participant in Integration)

### (Against Google)

102. Plaintiff realleges paragraphs 1 through 96 as if fully set forth here.

103. Character.AI is a product. It is mass-marketed software distributed in uniform copies to the public through app stores and the internet. This Count challenges Character.AI's design features: the features that let a user create a

public Character of a real, identifiable child, the absence of any safeguard for that child, and the features that promoted those Characters to other users. It does not arise from, and does not seek to impose liability for, the ideas, expression, or content of any Character or of any conversation.

104. John never used Character.AI. He is a bystander: a real child whose identity the product's design allowed others to take and publish. A manufacturer and a component supplier owe a duty to bystanders whom the defective product foreseeably injures, and John's injury from a product designed to simulate real people was foreseeable.

105. Google is liable as the supplier of components integrated into Character.AI and as a participant in their integration. The components Google supplied include (a) the conversational model technology and architecture first developed at Google, on which Character.AI's large language model was built, and (b) the computing infrastructure and tensor processing units, tailored to Character Technologies' needs, on which that model was trained and run and without which Character.AI could not have been built or operated.

106. Google substantially participated in integrating those components into the design of Character.AI. On information and belief, Google personnel worked with Character Technologies to train, optimize, and serve Character.AI's model on Google infrastructure, and Google provided that support over a period of years under a close commercial relationship.

107. Character.AI was defective in design when it left the control of Character Technologies and Google because, among other things, it:

(a) permitted any user to create and publish a Character using the name and photograph of a real, identifiable person without any consent or verification step;

(b) contained no filter or screening to prevent or flag Characters using the names or images of real minors, including known child performers;

(c) contained no age screening, parental consent mechanism, or other safeguard for Characters based on real minors;

(d) lacked any effective notice and takedown mechanism through which a real person or parent could report and remove Characters based on that person;

(e) used search, ranking, and recommendation features that surfaced and promoted Characters of real children to other users, grouped them under category labels such as "Boyfriend," and displayed chat counts designed to drive further engagement;

(f) permitted Characters of real minors to carry romantic and sexual content tags; and

(g) failed to implement reasonable screening, identity-verification, or vetting procedures for individuals creating and publishing Characters depicting real, identifiable minors, thereby permitting anonymous or unverified users, including individuals seeking to impersonate,

sexualize, exploit, or harass children, to create and distribute artificial representations of those children without meaningful oversight or accountability.

108. The integration of Google's components caused these defects. Character.AI's design choice to let any user publish a real person as a Character, without consent, filtering, or takedown, and to promote those Characters through its recommendation features, depended on the conversational technology Google developed and on serving infrastructure Google configured for real-time persona conversations at scale. Google participated in integrating those components into that design with knowledge of the absence of safeguards.

109. Safer alternative designs were available and feasible at negligible cost, including blocking public Characters that use the name or likeness of an identifiable real minor; requiring identity verification or documented consent before publishing a Character based on a real person; implementing reasonable screening, identity-verification, and vetting procedures for individuals creating Characters depicting real minors; restricting anonymous or unverified users from creating artificial representations of identifiable children; implementing safeguards to identify and prevent repeat offenders from creating unauthorized Characters of real children; utilizing name and image matching against reported identities and known child performers; output filters preventing disclosure of a real person's location, school, or birth date; barring romantic or sexual tags or

categorization for Characters representing minors; and a functioning notice and takedown process.

110. It was reasonably foreseeable to Google that a real child whose identity was used to build a Character would be injured by the product's use, including by a campaign of harassment by third parties, which was a foreseeable result of a product that published a real child's identity to other users, including under category labels such as "Boyfriend," and does not supersede Google's liability. John was within the class of persons Google should reasonably have expected to be harmed by the product's defects.

111. The defects existed when Character.AI left the control of Character Technologies and Google and when the Characters built on John's identity were created, displayed, and used. Those defects continued after October 22, 2024, and later Characters using John's identity were created and displayed on November 21, 2024, June 23, 2025, and September 6, 2025, as alleged in paragraphs 92 and 93.

112. The defects were a direct and proximate cause of John's injuries. As a direct and proximate result, John suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, reputational harm, expense of medical and psychological care, and loss of earnings and earning capacity. Ms. Doe has incurred medical expenses for John's care and has lost the value of his earnings and services during his minority. These losses are continuing.

WHEREFORE, Plaintiff demands judgment against Google for compensatory damages, punitive damages, costs, interest as allowed by law, and such further relief as the Court deems just.

## COUNT III

## Negligent Undertaking

## (Against Google)

113. Plaintiff realleges paragraphs 1 through 96 as if fully set forth here.

114. Florida recognizes liability under section 324A of the Restatement (Second) of Torts for one who undertakes to render services to another that he should recognize as necessary for the protection of third persons. *See Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1186 (Fla. 2003).

115. Google undertook, for consideration, to render services to Character Technologies that Google should have recognized as necessary for the protection of third persons, including the real people whose identities would be simulated on Character.AI. Those services included providing and operating the computing infrastructure on which Character.AI's model was trained and served and, on information and belief, engineering support in training, optimizing, and deploying that model.

116. Google failed to exercise reasonable care in performing that undertaking. It provided and tuned the infrastructure and support for a product that simulated real children without consent, and it did not use the knowledge and leverage its undertaking gave it to require or build basic safeguards. Google

continued that undertaking after October 22, 2024, and after later Characters using John's identity were created, as alleged in paragraphs 92 and 93.

117. Google's failure to exercise reasonable care increased the risk of harm to John. The campaign of harassment by third parties was a foreseeable result of that failure and of a product that published a real child's identity to other users and does not supersede Google's liability. On information and belief, Google also undertook to perform, in part, duties Character Technologies owed to third persons concerning the safe design and operation of its model.

118. As a direct and proximate result, John suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, reputational harm, expense of medical and psychological care, and loss of earnings and earning capacity. Ms. Doe has incurred medical expenses for John's care and has lost the value of his earnings and services during his minority. These losses are continuing.

WHEREFORE, Plaintiff demands judgment against Google for compensatory damages, punitive damages, costs, interest as allowed by law, and such further relief as the Court deems just.

## <u>COUNT IV</u>

## Aiding and Abetting and Concert of Action

## (Against Google)

119. Plaintiff realleges paragraphs 1 through 96 as if fully set forth here.

120. Non-party Character Technologies committed the following torts against John, for which Plaintiff seeks no relief against Character Technologies in this action:

(a) unauthorized publication of name or likeness under section 540.08, Florida Statutes, by publishing and displaying John's name, photograph, and likeness on Character.AI for purposes of trade and for commercial purposes without the consent of John or either of his parents, in each of the separate publications described in paragraphs 57 through 60;

(b) common-law invasion of privacy by misappropriation, by using John's name, image, likeness, and persona for its own benefit without consent;

(c) strict products liability for the design defects described in Count II; and

(d) negligence, by designing and operating Character.AI as described above and failing to enforce its own prohibition on appropriating a person's name and likeness.

121. Google had actual knowledge that Character Technologies was distributing a product that presented the risks described above and that it was using the names and likenesses of real people, including minors, without consent. On information and belief, Google evaluated the technology and the user experience on Character.AI, knew its user base included large numbers of minors,

knew that Characters based on real people were a core feature, and knew that the technology had been judged too risky to release under Google's own name. By no later than October 22, 2024, Google knew that Character.AI allowed the impersonation of real people, including real minors, without consent, as alleged in paragraphs 90 through 93. With that knowledge, Google continued its assistance while Characters bearing John's full legal name were published on November 21, 2024 and September 6, 2025.

122. Google provided substantial assistance to Character Technologies. That assistance included the model technology first developed at Google; specialized computing services and chips, not available to the general public and tailored to Character Technologies' needs, worth on information and belief tens of millions of dollars; investment through a convertible note; and, in August 2024, approximately $2.7 billion in consideration that sustained Character.AI's operations while Characters built on John's identity remained online. Google's assistance was sustained over several years and essential to the product.

123. Each publication of a Character built on John's identity after the August 2024 transaction, including those created on September 30, 2024, November 21, 2024, June 23, 2025, and September 6, 2025, was a separate violation that Google knowingly and substantially assisted.

124. In the alternative, Google is liable under section 876(a) of the Restatement (Second) of Torts because it acted in concert with Character Technologies under a common design: to bring conversational technology

developed at Google to the public outside Google's brand and safety review, with Google supplying the infrastructure and credit and later reacquiring the technology and team through the August 2024 transaction, including data acquired from interaction with minors. The torts described in paragraph 120 were committed in furtherance of that design.

125. Google's assistance was a substantial factor in causing John's injuries. The campaign of harassment by third parties was a foreseeable result of that assistance and of a product that published a real child's identity to other users, and does not supersede Google's liability. As a direct and proximate result, John suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, reputational harm, expense of medical and psychological care, and loss of earnings and earning capacity. Ms. Doe has incurred medical expenses for John's care and has lost the value of his earnings and services during his minority. These losses are continuing. John has also lost the reasonable royalty value of the use of his name and likeness.

WHEREFORE, Plaintiff demands judgment against Google for compensatory damages, punitive damages, costs, interest as allowed by law, and such further relief as the Court deems just.

## COUNT V

## Unjust Enrichment

## (Against Google)

126. Plaintiff realleges paragraphs 1 through 96 as if fully set forth here.

127. This Count is pleaded in the alternative. There is no contract between Google and John or either of his parents, and none of them consented to any use of John's identity.

128. John conferred a benefit on Google. On information and belief, Google obtained direct access to Character.AI user and conversation data, including Characters built on John's identity and the conversations users had with them, and used that data in its own business. Google also received revenue from the cloud services and application distribution that carried those Characters.

129. Google knew of the benefit and voluntarily accepted and retained it, including after October 22, 2024, and after later Characters using John's identity were created, as alleged in paragraphs 92 and 93.

130. It would be inequitable for Google to retain that benefit without paying for it, because it was derived from the unauthorized commercial use of a real child's identity, and John received nothing in return.

WHEREFORE, Plaintiff demands judgment against Google for restitution and disgorgement of the benefits Google obtained from the use of John's identity, costs, interest as allowed by law, and such further relief as the Court deems just.

## PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment in her favor and against Google and award:

(a) compensatory damages for John's past and future pain and suffering, emotional distress, mental anguish, disability, and loss of capacity for the enjoyment of life;

(b) damages for injury to John's reputation;

(c) past and future medical, psychological, and educational expenses;

(d) lost earnings, lost professional, appearance, and endorsement opportunities, and loss of future earning capacity;

(e) a reasonable royalty and other damages for the unauthorized use of John's name and likeness;

(f) restitution and disgorgement of benefits Google obtained from the use of John's identity;

(g) punitive damages;

(h) a permanent injunction requiring Google to stop using, and to identify and segregate, any data, model weights, or other material in its possession that was derived from Characters using John's name, image, or likeness, and to preserve all data relating to those Characters;

(i) taxable costs and pre- and post-judgment interest as allowed by law; and

(j) such further relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 19, 2026

Respectfully submitted,

/s/ Christopher M. Hudon
Christopher M. Hudon
Florida Bar No. 123845
CHRIS HUDON, PLLC
7165 53rd St.
Vero Beach, FL 32967
Telephone: 772-646-2912
cmh@hudon.law
christopher.m.hudon@outlook.com
*Lead Counsel for Plaintiff*

Maegan F. Bridwell
Florida Bar No. 111912
THE HAGGARD LAW FIRM
600 South Magnolia Avenue, Suite 310
Tampa, Florida 33606
Telephone: (813) 603-7934
MFB@haggardlawfirm.com
*Co-Counsel for Plaintiff*